**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|  |  |
|---|---|
| ROBERT ARRINGTON and SHANDALYN ARRINGTON, | |
| Plaintiffs, | Civil Action No. 3:26-cv-0569 |
| v. | |
| LAKEVIEW LOAN SERVICING, LLC and LOANCARE, LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Robert Arrington and Shandalyn Arrington file this Class Action Complaint against Lakeview Loan Servicing, LLC ("Lakeview") and LoanCare, LLC ("LoanCare") (collectively, "Defendants").  In support of their claims, the Arringtons allege as follows:

## PRELIMINARY STATEMENT

1.      Mr. Arrington, an 82-year-old resident of Fredericksburg, Virginia, served during the U.S. military operations in Vietnam. While on active duty, he was exposed to Agent Orange, a potent herbicide and defoliant used by the U.S. military to destroy jungle foliage and crops that provided cover for enemy forces.  As government agencies would soon discover, Agent Orange was highly toxic, causing severe long-term health issues in military veterans, including Mr. Arrington.

2.      As a result of this exposure, years ago, the Veterans Administration declared Mr. Arrington a 100-percent, service-connected, totally and permanently disabled veteran.

3.      Under Virginia law, this status exempted Mr. Arrington's principal residence, which he owns with his wife (Shandalyn Arrington), from state and local real estate taxes.  *See*

1

Va. Code § 58.1-3219.5 ("[T]he General Assembly hereby exempts from taxation the real property, including the joint real property of married individuals, of any veteran who has been rated by the U.S. Department of Veterans Affairs or its successor agency pursuant to federal law to have a 100 percent service-connected, permanent, and total disability, and who occupies the real property as his principal place of residence").

4.      Virginia is not alone in providing this real estate tax exemptions to those rendered disabled by their service to our country.  At least 22 states provide full property tax exemptions for the primary residence of veterans with some level of service-connected disability.[1]

5.      Despite the clear requirements of Virginia law (and the laws of other multiple other states), Defendants have charged Plaintiffs late fees and negatively reported delinquencies on their mortgage account to consumer reporting agencies because they have not paid Defendants for real estate taxes that they do not owe.

6.      Indeed, despite the Arringtons' exemption, Defendants, who serviced the Arringtons' mortgage, insisted that they pay hundreds of dollars extra each month into their escrow account for real estate taxes. Defendants also automatically debited the inflated amounts from the Arringtons' bank account.

7.      Then, when the Arringtons refused to pay the inflated escrow charges—that they did not owe—and instead only paid what was actually due under their loan, Defendants considered their loan in default, and charged them late fees and other default-related charges, all of which stemmed from its improper application of assessed real estate taxes to their escrow account.

---

[1] These states include Alabama, Arizona, Arkansas, Connecticut, Florida, Hawaii, Illinois, Iowa, Louisiana, Maryland, Michigan, Mississippi, Nebraska, New Hampshire, New Jersey, New Mexico, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.

2

8.      Making matters worse, Defendants also reported these delinquencies to the Arringtons' credit files, causing direct harm to their creditworthiness, and they refused to correct their reporting when Plaintiffs disputed the inaccuracies.

9.      Unfortunately, the Arringtons are not the only victims of Defendants' reckless conduct.  Upon information and belief, Defendants employ uniform policies and procedures for the assessment and collection of property taxes from borrowers who, like Plaintiffs, are exempt from real estate taxes under their relevant state laws.  Accordingly, Plaintiffs bring this case not only for themselves, but other similarly situated veterans who have been forced to pay real estate taxes that they do not owe.

10.     Defendants' treatment of the Arringtons and putative class members not only violates the clear language of Virginia law and the laws of many other states protecting disabled veterans, but it also constitutes a breach of the fiduciary duty that Defendants owed to the Arringtons and the putative class members with respect to their escrow accounts.  Defendants also acted negligently, resulting in their unjust enrichment from the fees charged and the interest accrued on the escrow accounts that they artificially inflated with improper real estate tax charges, all of which they got to keep.

11.     Further, LoanCare's actions violate the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e), because LoanCare failed to correct its errors within the time required by RESPA despite receiving proper notice of their errors under the Act from Plaintiffs and other similarly situated consumers, and continued to provide derogatory information regarding overdue payments during the 60-day period after LoanCare received the Arringtons' and other similarly situated consumers' Qualified Written Requests.

3

12. Plaintiffs also allege individual claims against LoanCare under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b), for their failure to properly investigate Plaintiffs' credit disputes and to review all relevant information provided by the consumer reporting agencies in violation of the FCRA.

## JURISDICTION AND VENUE

13. This Court has jurisdiction under 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 1681(p). It also has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367. The court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, in the aggregate, and the diversity requirements of that section are met.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the acts and transactions that form the basis of this Complaint occurred here.

## PARTIES

15. Plaintiffs Shandalyn Arrington and Robert Arrington are each a natural person and a consumer as defined by 15 U.S.C. § 1681a(c) and are residents of Virginia.

16. Lakeview is a foreign limited liability company with its principal place of business in Coral Gables, Florida. At all times relevant to this Complaint, Lakeview was a furnisher governed by the FCRA and a mortgage loan servicing company governed by RESPA.

17. LoanCare is a limited liability company with its principal place of business in Virginia Beach, Virginia. At all times relevant to this Complaint, LoanCare was a furnisher governed by the FCRA and a mortgage loan servicing company governed by RESPA.

4

## FACTS

### *Defendants' Mortgage Servicing Business*

18.    Lakeview is one of the largest mortgage servicers in the United States of America.

19.    LoanCare is one of the largest mortgage subservicers in the United States of America.    As a subservicer, LoanCare is contracted by Lakeview to handle the day-to-day servicing of the loans in its portfolio, while Lakeview retains the overall servicing rights to the loan.

20.    LoanCare was acting on behalf of Lakeview as its agent at all relevant times.

21.    As is customary in mortgage lending, a borrower, like Plaintiffs, has no say in who services his or her mortgage loan.

22.    As mortgage servicers, Defendants manage the day-to-day aspects of consumers' mortgage loans, including collecting and applying monthly payments, maintaining escrow accounts, communicating with borrowers about their loans, reporting payment information to various credit bureaus, and managing the foreclosure process when a consumer becomes delinquent.

23.    Pertinent to this litigation, Defendants manage escrow accounts for the mortgages that they service. A mortgage escrow account is "a trust account set up in a borrower's name to ensure the timely payment of specified obligations affiliated with a property." H.R. Rep. No. 111-94, at 53 (2009).

24.    Under escrow arrangements, borrowers pre-pay a set amount into their escrow accounts on a regular, typically monthly, basis. *Id.* Lenders "then use these collected sums to

guarantee the timely payment of property tax bills and insurance premiums." *Id.* When the mortgage is satisfied, any money remaining in escrow is returned to the borrower.

25.    Defendants receive significant servicing income from interest earned on borrowers' tax and insurance payments, which are held in an escrow account between the time the payments are collected and the time they are paid out to the appropriate insurance or taxing authority. A substantial part of Defendants' servicing revenue, therefore, is dependent on escrow disbursement timing, escrow analysis, and escrow cushion requirements. *See* Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, Georgetown Law and Economics Research Paper No. 11-01 (Dec. 15, 2010) at 39 (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1324023).

26.    This float income can be very profitable. For example, Ocwen showed an average balance of $677 million for escrow accounts in 2007, generating $30 million in revenue. Countrywide Mortgage reported holding $19.2 billion in borrower and investor custodial cash accounts at the end of December 2007, which produced significant float income via interest earned on those accounts. *Id.* at 40 (citing Countrywide Fin. Corp., Annual Report (Form 10-K) F-99 (Feb. 29, 2008), available at http://www.secinfo.com/dVut2.t21n.htm.)

27.    Defendants also make servicing income from assessing and collecting late fees, foreclosure fees, and other default-related fees to borrowers' accounts. *Id.*  at 41. Under most

servicing agreements, Defendants are allowed to keep all of these fees for themselves and do not have to pay them to the owner of the mortgage. *Id.* at 41.

28.    These fees are likewise highly profitable for mortgage servicers.

29.    Defendants are, therefore, financially motivated to require consumers to maintain as large an escrow balance as possible, and to aggressively enforce the balance of escrow accounts through late fees and other default-related charges.

30.    This financial motivation has resulted in Defendants mismanaging escrow accounts for years.

31.    For example, a cursory search of the CFPB's consumer complaint database shows hundreds of complaints made against Defendants for escrow-related issues. https://www.consumerfinance.gov/data-research/consumer-complaints/

32.    As detailed below, Plaintiff and the putative class members are also victims of Defendants' aggressive and improper escrow accounting policies.

### *Defendants Charge the Arringtons for Taxes that They Did Not Owe*

33.    The Arringtons purchased their home in Spotsylvania County, where they currently live, in or around January 2021.

34.    Neither Lakeview nor LoanCare was the original servicer or lender.

35.    In or around November 2022, Lakeview began servicing the Arringtons' mortgage. At the same time, LoanCare began acting as the subservicer, servicing the loan as Lakeview's agent on behalf of Lakeview.

36.    Plaintiffs did not enter into a contract with either of the Defendants.

37.    Defendants set up an escrow account in the Arringtons' name, which was a trust account managed and overseen by Defendants.

38.    Since Lakeview and LoanCare took over servicing the Arringtons' mortgage, the Arringtons have made all of their monthly payments to Defendants.

39.    Mr. Arrington is a 100-percent disabled veteran, so the Arringtons are exempt from paying property taxes in Spotsylvania County under Virginia law.

40.    Defendants knew the Arringtons were exempt from paying property taxes, as such information is readily available to mortgage servicers through centralized databases used to determine the property taxes owed by each borrower.

41.    Indeed, before Defendants began servicing the loan, two prior mortgage servicers had serviced the loan and neither attempted to collect the property taxes that the Arringtons were exempt from paying.  This is because they knew the taxes were not owed by the Arringtons and thus did not charge them for those taxes as part of the escrow charges.

42.    Then, in March 2025, Defendants informed the Arringtons that their new payment would be $3,352.11, or $758 higher than the previous payment.  Defendants debited this payment from the Arringtons' bank account and sent another notice saying their April 2025 payment would be $3,172.51, almost $600 higher than the normal payment.  Defendants inflated the Arringtons payments purportedly to cover property taxes on the Arringtons' property.

43.    These additional charges were incorrect.  The Arringtons were tax exempt and did not owe any money for property taxes.

44.    The Arringtons do not have the money to pay an extra $600 or $700 per month for monies they do not owe, but they did not want to get behind on their most important financial commitment, their mortgage.

45.    The Arringtons contacted Defendants about the inflated payments.  Defendants claimed they had made a disbursement to Spotsylvania County for the Arringtons' property taxes,

resulting in the higher monthly payment.  However, Defendants informed the Arringtons that Defendants had not received any documentation from Spotsylvania County requesting payment of the property taxes.

46.    Then, when the Arringtons did not pay the additional amount for the property taxes that they did not owe and that had not been billed by their local government, Defendants went a step further, assessing a late fee of $103.35, an inspection fee of $25.00, and a second late fee of $126.90.

47.    Defendants also reported to the credit bureaus that the Arringtons' payments in May and June 2025 were delinquent.

48.    In May 2025, Defendants sent a statement indicating that the Arringtons owed $8,570.28, which represented two correct mortgage payments, one inflated payment, late fees, and an inspection fee.

49.    Faced with the negative impact of Defendants' credit reporting and the potential loss of their home if they did not pay, on June 9, 2025, the Arringtons paid $8,443.38.  This payment should have satisfied the amounts due in April, May, and June.

50.    The Arringtons attempted to contact Defendants numerous times in 2025 to resolve this dispute, but Defendants never corrected their improper assessment of late fees and negative credit reporting for unpaid taxes that they did not owe.

51.    The inspection fee remains listed as past due on Plaintiffs' monthly statements.

### *Defendants Refuse to Correct Their Inaccurate Reporting in Response to the Arringtons' Disputes*

52.    In June of 2025, the Arringtons checked their credit reports and saw that Defendants were reporting their mortgage as having a past due balance and a derogatory payment history.

53. Again, this reporting was inaccurate. The Arringtons paid their mortgage each month but because Defendants used amounts paid to pay property taxes they did not owe, the payments were not applied properly. The inaccurate reporting stemmed from Defendants erroneously adding improper escrow charges to their account for property taxes that they did not owe.

54. In July 2025, the Arringtons each submitted disputes to Equifax, Experian, and Trans Union about the inaccurate information. They included proof of the tax-exempt status and the statements showing the inaccurate escrow amounts. They explained why the escrow was incorrect and asked that the mortgage be updated to show the correct status.

55. Upon information and belief, the credit bureaus forwarded this information to Defendants.

56. Defendants failed to investigate the substance of the Arringtons' dispute and instead verified the derogatory payment history and past due balance as correct. Upon information and belief, Defendants relied on investigators who simply regurgitated the contents of pre-determined delinquency information on a computer screen and did not cross-check this information against anything provided by the Arringtons in support of their dispute.

57. As a result of Defendants' failed investigation, Defendants continued to report their mortgage account as delinquent, harming their credit score and creditworthiness.

58. Because their credit was important to them, each of the Plaintiffs mailed four more follow-up dispute letters to Equifax, Experian, and Trans Union in September and November 2025 and March and May of 2026.

59. The letters explained again that the payment history for their mortgage was incorrect and stemmed from improper escrow charges. The Arringtons also submitted supporting

documentation that the escrow charges were improper, including proof that Mr. Arrington had a 100 percent, service-connected disability, as determined by the Veterans Administration.

60. Again, upon information and belief, the credit bureaus forwarded the Arringtons' disputes to Defendants.

61. Despite the Plaintiffs' disputes and the supporting documentation, Defendants refused to remove the inaccurate, derogatory information from the Arringtons' credit reports. Upon information and belief, Defendants instead regurgitated predetermined loan history information on a computer screen back to the credit bureaus without cross-checking this information against any of the evidence provided by the Arringtons or other documentation in their systems or that could be readily accessed from the local government to which the Arringtons supposedly owed the real estate taxes.

62. At all times relevant to this Complaint, Defendants' processing of consumer disputes was willful and carried out in reckless disregard for a consumer's rights under the FCRA. For example, Defendants' conduct was willful because it was done in accordance with Defendants' intended procedures. In addition, Defendants prioritize processing disputes quickly rather than making sure that the disputes are investigated thoroughly and accurately. And Defendants are acutely aware of their responsibilities under the FCRA through their role in the mortgage industry and the numerous lawsuits to which they have been subject challenging the very investigative practices at issue in this litigation.

***Defendants Violate RESPA by Continuing to Report Plaintiff as Delinquent After their Qualified Written Request and Failing to Correct the Errors within the Required Time***

63. In addition to repeatedly informing Defendants of their errors through credit disputes and other communications, Plaintiffs sent Defendants a Qualified Written Request in March 2026.

64.    This Qualified Written Request was sent to the address that Defendants designate for these correspondences.

65.    Plaintiffs' Qualified Written Request asked Defendants to investigate the inaccurate escrow amounts, update their payment history, reverse late fees, reimburse them for inflated payments made by Plaintiffs, remove the outstanding property inspection charge, and correct the inaccurate reporting with the credit bureaus.

66.    In addition, Plaintiffs' Qualified Written Request asked for information regarding communications with Spotsylvania County regarding their purported real estate taxes.

67.    Defendants received Plaintiffs' Qualified Written Requests and sent them a letter acknowledging receipt on March 11, 2026.

68.    Despite receiving Plaintiffs' Qualified Written Request, Defendants continued to report the disputed payment information to the credit bureaus within 60 days of their receipt of Plaintiffs' Qualified Written Request.

69.    For example, Ms. Arrington's Trans Union report continued to show the delinquent payment history as of April 2, 2026, during the 60-day window after Defendants' receipt of Plaintiffs' Qualified Written Request.

70.    Despite this, in response to their repeated disputes, Defendants sent a letter dated April 29, 2026, informing Plaintiffs that the derogatory reporting would be corrected.

71.    Additionally, Defendants acknowledged that the taxes were paid in error on the Arringtons' account in their May 7, 2026 response to the Plaintiffs' Qualified Written Request.

72.    Defendants also said it would credit the late fee that was paid by the Arringtons on June 9, 2025, but this has still not been done as of the date of filing this lawsuit.

12

73.    Defendants failed to address the issue of the property inspection fee, and they continue to demand payment of this fee from Plaintiffs in their July 2026 mortgage statement.

74.    Further, the Plaintiffs credit reports still show derogatory reporting, and the promised corrections have still not been made.

75.    Defendants did not correct the errors within 45 days of receipt the Arringtons' Qualified Written Request.  Defendants did not correct the delinquent credit reporting, remove the past due charges, or refund Plaintiffs' improper payments within 45 days.

76.    As a result of Defendants' conduct, the Arringtons suffered significant actual damage.  For example, they have paid a late fee they did not owe, a property inspection fee continues to be assessed to their account, and their credit scores have dropped by almost 200 points, preventing any other credit transactions.  The Arringtons were also worried that their home would be referred to foreclosure even though they were making payments, which caused them emotional distress.

## COUNT ONE:
### Breach of Fiduciary Duty
### (Class Claim Against All Defendants)

77.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

78.    Under Rule 23 of Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class (the "Breach of Fiduciary Duty Class"):

> All consumers: (1) whose primary residence is located in a state that provides for a property tax exemption for disabled veterans and subject to a mortgage serviced by Defendants; (2) who are exempt from real estate property taxes due to their status as a disabled veteran; and (3) were nonetheless charged for property taxes as part of their escrow account payments within the two years predating the filing of this action.

79.      **Numerosity**. **Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Defendants are among the nation's largest mortgage servicers. Upon information and belief, thousands of tax-exempt disabled veterans were the subject of Defendants' improper escrow procedures during the class period.  These class members' names and addresses are identifiable through Defendants' internal business records and they may be notified of this litigation by published or mailed notice.

80.      **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants owed a fiduciary duty to Plaintiffs and the putative class members; (2) whether Defendants breached their fiduciary duty by mismanaging Plaintiffs' and the putative class members' escrow accounts; and (3) the proper amount of damages.

81.      **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

82.      **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the putative class

members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

83.    **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

84.    At all times relevant to his Complaint, Defendants were acting as escrow agents for Plaintiffs and the putative class members.

85.    In the alternative, Plaintiffs and the putative class members placed a special confidence in Defendants to properly manage their escrow account.

86.    Therefore, Defendants owed a fiduciary duty to Plaintiffs and the putative class members to act in good faith and with due regard in managing Plaintiffs' and the putative class members' escrow accounts that it held in trust.

15

87.    Defendants' conduct, including making improper disbursements from the escrow accounts for property taxes that were not due, breached the fiduciary duty that they owed to Plaintiffs and the putative class members.

88.    Plaintiffs and the putative class members were damaged by Defendants' breaches of their fiduciary duty, including lost equity in their homes from the inflated balances mortgage balances, the assessment and payment of late fees and other charges for supposed default, and payment of escrow amounts that they did not owe, as well as emotional distress from the threatened loss of their homes if they did not pay amounts that were not rightfully owed.

89.    Because they knew that Plaintiffs and the putative class members did not owe property taxes, Defendants' conduct with respect to Plaintiffs and the putative class members was either malicious or so reckless or negligent that it demonstrated a conscious disregard for their rights.

90.    As a result, Plaintiffs and the putative class members are entitled to recover compensatory and actual damages from Defendants.

## COUNT TWO:
### Unjust Enrichment
### (Class Claim Against All Defendants)

91.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

92.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class (the "Unjust Enrichment Class"):

All consumers: (1) whose primary residence is located in a state that provides for a property tax exemption for disabled veterans and subject to a mortgage serviced by Defendants; (2) who are exempt from real estate property taxes due to their status as a disabled veteran; (3) against whom Defendants assessed exempted property taxes to their escrow account and subsequently charged late fees or any other

16

default-related fees to the account; and (4) who paid or attempted to pay any amount toward these taxes and fees in the three years predating the filing of this litigation.

93.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Defendants are among the nation's largest mortgage servicers. Upon information and belief, thousands of tax-exempt disabled veterans were the subject of Defendants' improper escrow procedures during the class period.  These class members' names and addresses are identifiable through Defendants' internal business records and they may be notified of this litigation by published or mailed notice.

94.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the putative class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retention of the benefit would be unjust; and (4) the proper amount of damages.

95.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

96.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the putative class

17

members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

97.    **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

98.    From their own records and other information readily available to them and used by them as a matter of business practice, Defendants knew that Plaintiffs and the putative class members did not owe real estate taxes.

99.    Despite this, Defendants charged Plaintiffs' and the putative class members' escrow accounts for real estate taxes. When Plaintiffs and the putative class members did not pay Defendants inflated escrow amounts, Defendants started assessing improper late fees and other default-related fees to their accounts.

100.    Plaintiffs and the putative class members conferred a benefit on Defendants when they paid these inflated escrow amounts and/or improper fees, as Defendants generate significant

income from the interest accrued on escrow account balances that they manage as well as the collection of default-related fees.

101. Defendants knew or should have known that these inflated amounts and fees were improper and that they should have been reversed and repaid to Plaintiffs and the putative class members along with any interest accrued.

102. Because these inflated amounts and fees are improper, it would be unjust for Defendants to retain them and the interest associated with them.

103. Therefore, Plaintiff and the putative class members are entitled to recover the amounts they paid towards these improper fees and charges from Defendants, with interest.

**<u>COUNT THREE:</u>**
**Negligence**
**(Class Claim Against All Defendants)**

104. Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

105. Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seeks certification of the following class (the "Negligence Class"):

> All consumers: (1) whose primary residence is located in a state that provides for a property tax exemption for disabled veterans and subject to a mortgage serviced by Defendants; (2) who are exempt from real estate property taxes due to their status as a disabled veteran; and (3) whose escrow account statements show payments to a third party for property taxes or were assessed late fees or default-related charges within the two years predating the filing of this action.

106. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Defendants are among the nation's largest mortgage servicers. Upon information and belief, thousands of tax-exempt disabled veterans were the subject of Defendants' improper escrow procedures during the

19

class period.  These class members' names and addresses are identifiable through Defendants' internal business records and they may be notified of this litigation by published or mailed notice.

107.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants assumed a duty of care with respect to Plaintiffs and the putative class members; (2) whether Defendants breached their assumed duty of care; and (3) the proper amount of damages.

108.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

109.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

110.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

20

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

111. Plaintiffs and the putative class members were required to maintain an escrow account.

112. Defendants assumed the duty of servicing Plaintiffs' and the putative class members' mortgage loans, including the administration of their escrow account.

113. Neither the Plaintiffs nor any of the putative class members chose Defendants to be their mortgage servicer. Instead, Defendants sought out and assumed the servicing duties for these mortgages for their own financial benefit.

114. In assuming the servicing of Plaintiffs' and the putative class members' loans, Defendants were required to exercise reasonable care and prevent foreseeable harm in administering their escrow accounts and servicing their loans.

115. Defendants' duty of care also arose because of the special relationship between them, on the one hand, and Plaintiffs and the putative class members, on the other hand. This special relationship arose because Plaintiffs and the putative class members entrusted Defendants with their mortgage payments and proper management of their escrow accounts. Defendants alone

were able to ensure that these payments were managed properly and the appropriate amounts were held in escrow accounts.

116.    Defendants breached this duty by their conduct, including by assessing real estate taxes to the escrow accounts that were not due, taking monies intended to pay the principal and interest on a mortgage loan and diverting them to escrow accounts, making improper payments out of the escrow accounts, refusing to acknowledge that Plaintiffs and the putative class members did not owe real estate taxes, and assessing improper late fees and default-related charges as a result of its escrow mismanagement.

117.     Plaintiffs and the putative class members were damaged by Defendants' breaches of their assumed duty of care. For example, they experienced shortages in their escrow accounts, which led to being billed for amounts that they did not owe and the assessment of late fees and other default-related fees to their account.  They also suffered improper credit reporting and other non-economic damages.

118.    But for Defendants' breach, Plaintiffs and the putative class members would not have suffered these injuries.

119.    Because they knew that Plaintiffs and the putative class members did not owe property taxes, Defendants' conduct with respect to Plaintiffs and the putative class members was either malicious or so reckless or negligent that it demonstrated a conscious disregard for their rights.

120.    As a direct and proximate cause of Defendants' negligence, Plaintiffs and the putative class members are entitled to recover their compensatory and punitive damages from Defendants.

**COUNT FOUR:**
**Violation of RESPA, 12 U.S.C. § 2605(e) and 12C.F.R. § 1024.35**
**(Class Claim Against LoanCare)**

121.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

122.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class (the "RESPA Error Resolution Class"):

> All consumers: (1) whose mortgage is serviced by LoanCare; (2) who sent a Qualified Written Request to LoanCare regarding an error in the mortgage account; (3) for whom LoanCare sent a response to the Qualified Written Request acknowledging an error and stating that LoanCare would correct the error; and (4) LoanCare did not correct the error within 45 days of receipt of the consumer's Qualified Written Request.

123.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Defendants are among the nation's largest mortgage servicers. Upon information and belief, thousands of consumers were the subject of LoanCare's improper procedures for responding to Qualified Written Requests.  These class members' names and addresses are identifiable through LoanCare's internal business records and they may be notified of this litigation by published or mailed notice.

124.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether LoanCare was required to take corrective action in response to a Qualified Written Request within 30 days (or 45 days if extended); (2) whether LoanCare's conduct violated RESPA; and (3) the proper amount of damages.

125.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

126.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

127.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by LoanCare's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

24

128.    In assuming the servicing of Plaintiffs' and the putative class members' loans, LoanCare was required to make appropriate corrections in Plaintiffs' and the putative class members' mortgage accounts within 30 days of receiving a Qualified Written Request (or 45 days if extended pursuant to notice to the consumer).

129.    Alternatively, LoanCare was required to provide the Plaintiffs and putative class members with a written explanation why they believe the account is accurate within 30 days of receiving a QWR (or 45 days if extended pursuant to notice to the consumer).

130.    In response to Qualified Written Requests from Plaintiffs and putative class members, LoanCare violated 12 U.S.C. § 2605(e) and 12C.F.R. § 1024.35 by failing to correct the errors in Plaintiffs' and the putative class members' accounts within 30 days of receiving a Qualified Written Request (or 45 days if extended pursuant to notice to the consumer).

131.    Plaintiffs and the putative class members were damaged by LoanCare's failure to properly respond to their Qualified Written Requests. For example, they experienced shortages in their escrow accounts, which led to being billed for amounts that they did not owe and the assessment of late fees and other default-related fees to their account.  They also suffered improper credit reporting and other non-economic damages, including informational injuries and emotional distress and frustration from Defendants' unwillingness to timely correct their accounts.

132.    Upon information and belief, discovery will demonstrate that LoanCare's noncompliance with 12 U.S.C. § 2605(g) is part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(g), including because this conduct was a result of LoanCare's standard procedures that was used in responding to Qualified Written Requests.

25

133.    Plaintiffs and the putative class members are thus entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Defendants for their violations of 12 U.S.C. § 2605(g) in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f).

**COUNT FIVE:**
**Violation of RESPA, 12 U.S.C. § 2605(e)(3)**
**(Class Claim Against LoanCare)**

134.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

135.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class (the "RESPA Reporting Class"):

> All consumers: (1) whose mortgage is serviced by LoanCare; (2) who sent a Qualified Written Request to LoanCare relating to a dispute regarding the consumer's payments; (3) for whom LoanCare provided information regarding the overdue payment identified in the Qualified Written Request to any consumer reporting agency during the 60-day period beginning on the date LoanCare received the Qualified Written Request.

136.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Defendants are among the nation's largest mortgage servicers. Upon information and belief, thousands of consumers were the subject of LoanCare's improper credit reporting procedures during the class period.  These class members' names and addresses are identifiable through Defendants' internal business records and they may be notified of this litigation by published or mailed notice.

137.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether LoanCare ceased providing negative payment information during the 60-days

26

following receipt of a Qualified Written Request; (2) whether LoanCare's conduct violated RESPA; and (3) the proper amount of damages.

138. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

139. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

140. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

141. LoanCare violated 12 U.S.C. § 2605(e)(3) by continuing to provide derogatory information regarding the overdue payments within 60 days after LoanCare received Plaintiffs' and the putative class members' Qualified Written Request.

142. Because of LoanCare's conduct, Plaintiffs and the putative class members suffered concrete and particularized harm, including the reduction of their credit score and emotional distress.

143. Upon information and belief, discovery will demonstrate that LoanCare's noncompliance with 12 U.S.C. § 2605(e)(3) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e), including because this conduct was a result of LoanCare's standard procedures that was used in responding to all Qualified Written Requests.

144. Upon information and belief, LoanCare does not have a procedure in place to freeze negative payment information when they receive a Qualified Written Request challenging the validity of the payment information.

145. Plaintiffs and the putative class members are entitled to recover actual damages, statutory damages, costs, and attorney's fees from Defendants for their violations of 12 U.S.C. § 2605(e)(3) in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f).

**COUNT SIX:**
**Violation of FCRA, 15 U.S.C. §1681s-2(b)(1)(A)**
**(Individual Claim Against LoanCare)**

146. Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

147.    On one or more occasion within the past two years, by example only and without limitation, LoanCare violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiffs' credit disputes.

148.    When Plaintiffs disputed their account with the credit bureaus, LoanCare used a dispute system named "e-Oscar," which has been adopted by the consumer reporting agencies and their furnisher customers (such as LoanCare). E-Oscar is an automated system, and the procedures used by the credit reporting agencies are systematic and uniform.

149.    When a consumer reporting agency receives a consumer dispute, it (usually via an outsourced vendor) translates each dispute into an automated consumer dispute verification ("ACDV") form.

150.    Upon information and belief, the ACDV form is the method by which LoanCare elected to receive consumer disputes pursuant to 15 U.S.C. § 1681i(a).

151.    Upon information and belief, Experian, Equifax, and Trans Union each forwarded Plaintiffs' disputes via ACDV forms to Defendants.

152.    LoanCare understood the nature of Plaintiffs' disputes when it received the ACDV forms.

153.    Upon information and belief, when LoanCare received the ACDV form containing Plaintiffs' dispute, LoanCare followed a standard and systematically unlawful process where LoanCare only reviews its own internal computer screen for the account and repeats back the same information to the ACDV system that was previously reported to the consumer reporting agency.

154.    Upon information and belief, when LoanCare receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in its computer system is itself accurate.

29

155.    As a result of LoanCare's violations of 15 U.S.C. § 1681s-2(b)(1)(A), Plaintiffs suffered concrete and particularized harm, including a reduced credit score, stress, and other emotional distress.

156.    LoanCare's conduct in violating 15 U.S.C. § 1681s-2(b)(1)(A) was willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, LoanCare was negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

157.    Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from LoanCare in an amount to be determined pursuant to 15 U.S.C. §§ 1681n and 1681o.

**COUNT SEVEN:**
**Violation of FCRA, 15 U.S.C. § 1681s-2(b)(1)(B)**
**(Individual Claim Against LoanCare)**

158.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

159.    On one or more occasion within the past two years, LoanCare violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

160.    As Plaintiffs detailed in the previous Count, LoanCare has elected to use the e-Oscar system for its FCRA disputes received through the consumer reporting agencies, including for Experian, Equifax, and Trans Union.

161.    When it received the ACDV forms from the consumer reporting agencies, LoanCare did not review any of the documentation that Plaintiffs attached to their dispute, which demonstrated that Plaintiffs had not made any late payments on their mortgage.

162. If LoanCare had reviewed these documents, which included proof of their tax-exempt status and proof of their mortgage payments, then they would have known that their previous reporting was incorrect and needed to be updated.

163. As a result of LoanCare's violations of 15 U.S.C. § 1681-2(b)(1)(B), Plaintiffs suffered concrete and particularized harm, including but not limited to a reduced credit score, stress, and other emotional distress.

164. LoanCare's violations of 15 U.S.C. § 1681s-2(b)(1)(B) were willful, rendering it liable for punitive damages in an amount to be determined pursuant to 15 U.S.C. §§ 1681n and 1681o.

165. Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from LoanCare in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

WHEREFORE, Plaintiffs, on behalf of themselves and the putative class members, move for class certification and for statutory, actual, and punitive damages, as well as their attorneys' fees and costs against Defendants for the class claims, as well as actual, statutory, and punitive damages and attorneys' fees and costs for their individual claims; for pre-judgment and post-judgment interest at the legal rate, and such other relief the Court does deem just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**SHANDALYN ARRINGTON &**
**ROBERT L. ARRINGTON**

By: */s/ Kristi C. Kelly*
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
Pat McNichol, VSB #92699
Matthew Rosendahl, VSB #93738
Patrick Dillard, VSB #89119
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com
Email: pdillard@kellyguzzo.com
*Counsel for Plaintiff*